IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
WESTERN DIVISION

UNITED STATES OF AMERICA

v.                                                    CRIMINAL CASE NO. 3:09-CR-00002-GHD

RICHARD F. "DICKIE" SCRUGGS


<u>MEMORANDUM OPINION</u>

Presently before the Court is a motion to vacate and set aside conviction pursuant to 28 U.S.C. § 2255 [125] filed by the Petitioner Richard F. "Dickie" Scruggs (the "Petitioner," "Dickie Scruggs," or "Scruggs"). Upon due consideration of the extensive record, including the petition, response, reply, exhibits, rules, authorities, and testimony presented in the evidentiary hearing, the Court is ready to rule.

*A. Factual and Procedural Background*

In a meeting with the FBI to discuss his involvement in the bribery of state circuit court Judge Henry Lackey,[1] attorney Timothy Balducci first revealed that he had been privy to another matter in which Dickie Scruggs had bribed a different state circuit court judge for a favorable outcome in a case. The judge was Bobby B. DeLaughter. The case was *Wilson v. Scruggs*, Cause No. 251-94-582, in the Circuit Court of Hinds County, Mississippi. *Wilson* was a suit concerning the division of legal fees in asbestos litigation; Dickie Scruggs' former associate, Robert Wilson, claimed Scruggs had wrongfully withheld millions of dollars from him.[2] The hailstorm that followed Balducci's revelation culminated in Scruggs' guilty plea to a one-count

---

[1] Judge Henry Lackey had presided over *Jones v. Scruggs*, Civil Action No. L07-135, in the Circuit Court of Lafayette County, Mississippi. *Jones* was a civil suit against the Petitioner concerning the division of legal fees arising from the settlement of numerous Hurricane Katrina damage claims. In Cause No. 3:07-CR-00192, Balducci pled guilty to conspiracy to commit honest services wire fraud and federal program bribery (18 U.S.C. §§ 2, 371, 666(a)(2)(b), 1343, 1346) for his acts in conspiring to bribe state circuit court Judge Henry Lackey in connection with *Jones*.

[2] Pet'r's Plea Colloquy [126-5] at 5.

information charging him with aiding and abetting in honest services mail fraud (18 U.S.C. §§ 2, 1341, 1346) for his role in a secret scheme to corrupt then-Judge DeLaughter in connection with the *Wilson* case.

Scruggs admitted under oath at his plea colloquy that the corruption scheme exploited two of DeLaughter's vulnerabilities: "[f]irst, his close association with former district attorney Ed Peters, and, second, his known ambition to become a federal judge."[3] Scruggs further admitted that the scheme involved "contact[ing] his brother-in-law [Trent Lott], then a United States Senator from Mississippi, to recommend [DeLaughter] for consideration for a federal district judgeship then open in the Southern District of Mississippi."[4] Ed Peters was hired to corrupt then-Judge DeLaughter while *Wilson* was pending.

Several federal district judgeship vacancies occurred in the Southern District of Mississippi during the pendency of the *Wilson* litigation. U.S. District Judge William H. Barbour, Jr., assumed senior status on February 4, 2006;[5] U.S. District Judge David C. Bramlette assumed senior status on March 20, 2006;[6] and U.S. District Judge Tom S. Lee assumed senior status on April 8, 2006.[7] Nominations for the open judgeships were as follows: Judge Daniel P. Jordan was nominated for Judge Lee's seat on April 24, 2006;[8] Judge Leslie Southwick was nominated for Judge Barbour's seat on June 6, 2006;[9] and Judge Sul Ozerden was nominated to fill Judge Bramlette's seat on January 9, 2007.[10] Interestingly, Judge Barbour's seat remained vacant from February 4, 2006, until December 20, 2010. Although

---

[3] *Id.* at 6.
[4] *Id.* at 6–7.
[5] *See* Pet'r's Ex. 35.
[6] *See* Pet'r's Ex. 36.
[7] *See* Pet'r's Ex. 37.
[8] *See* Pet'r's Ex. 38.
[9] *See* Pet'r's Ex. 39.
[10] http://www.fjc.gov/servlet/nGetInfo?jid=3145&cid=999&ctype=na&instate=na.

Judge Southwick had been nominated for the seat on June 6, 2006, his nomination was subsequently withdrawn when he was nominated to fill a vacancy on the Fifth Circuit Court of Appeals. Judge Carlton Reeves assumed the seat on December 20, 2010.[11]

Pursuant to the terms of the plea agreement, the Government moved to dismiss the indictment which charged the Petitioner with conspiracy to violate the federal programs bribery statute, 18 U.S.C. § 666 (Count I), and three counts of aiding and abetting in honest services mail fraud in violation of 18 U.S.C. §§ 2, 1341, 1346 (Counts II–IV). The Petitioner was subsequently sentenced to seven years in the custody of the United States Bureau of Prisons and three years of supervised release, both to run concurrently with the five-year sentence he received in Cause No. 3:07-CR-00192; the Court also imposed a $100,000.00 fine.[12]

On June 23, 2011, the Petitioner timely filed a 28 U.S.C. § 2255 motion to vacate or set aside his conviction based on *Skilling v. United States*, ____ U.S. ____, 130 S. Ct. 2896 (June 24, 2010), which confined the reach of the honest services statute to "paradigmatic cases of bribes and kickbacks." *See Skilling*, 130 S. Ct. at 2932–2933.

The Petitioner concedes that the scheme to corrupt DeLaughter was "reprehensibly unethical," and the type of contact that "threatens the very heart of the judicial system."[13] However, he argues that the scheme did not involve the core requirement of a bribe, a *quid pro quo*, and therefore, that he is actually innocent of the crime to which he pled guilty. A *quid pro quo* is defined as a "special intent to give or receive something of value in exchange for an

[11] http://www.fjc.gov/servlet/nGetInfo?jid=3163&cid=999&ctype=na&instate=na;
http://www.fjc.gov/servlet/nGetInfo?jid=3346&cid=999&ctype=na&instate=na.
[12] In Cause No. 3:07-CR-00192, the Petitioner pleaded guilty to conspiracy to commit honest services wire fraud and federal program bribery (18 U.S.C. §§ 2, 371, 666(a)(2)(b), 1343, 1346) for his acts in conspiring to bribe state circuit court Judge Henry Lackey in connection with *Jones v. Scruggs*, Civil Action No. L07-135, in the Circuit Court of Lafayette County, Mississippi. The Petitioner was sentenced to five years in the custody of the United States Bureau of Prisons and three years of supervised release, and he was assessed a $250,000 fine.
[13] Pet'r's Proposed Findings of Fact & Conclusions of Law [213] at 9.

official act." *United States v. Sun-Diamond Growers of Calif.*, 526 U.S. 398, 404–05, 119 S. Ct. 1402, 143 L. Ed. 2d 576 (1999). The Petitioner maintains that the case *sub judice* involved a mere verbal recommendation, which cannot constitute a thing of value, and, thus, that the requisite *quid pro quo* was not established.

The Government argues in response that the Petitioner's § 2255 motion merely attacks the sufficiency of the Government's evidence—not the crime itself. And further, the Government contends that a paradigmatic bribe existed, because the Petitioner used the "lure of a federal judgeship" to "make Bobby DeLaughter think Scruggs was helping him attain his goal of becoming a federal judge," and, in return, DeLaughter "rule[d] in favor of Scruggs while giving team Scruggs the advantage of secret access to the Court."[14]

An evidentiary hearing was held on March 26 and 27, 2012. Prior to the evidentiary hearing, this Court ruled that *Skilling* should be applied retroactively, as the decision is substantive and narrows the scope of the honest services fraud statute by interpreting its terms.[15] The Court also ruled that the § 2255 petition was timely, because it was filed within one year of the *Skilling* decision.[16] The Court found that the Petitioner procedurally defaulted on the claim he now raises because he failed to file a direct appeal and could not show "cause" for his default.[17] The Court found that the exhibits submitted by the Government in response to the petition, as well as the Court's own file in a companion case, *United States of America v. Joseph C. Langston*, Cause No. 1:08-CR-00003, created a genuine issue as to whether the Petitioner aided and abetted in a bribery scheme.[18] The evidentiary hearing gave the Petitioner an

---

[14] Gov't's Combined Mem. of Auth. & Resp. Opp'n to Pet'r's § 2255 Mot. [135] at 3–4.
[15] *See* Ct's Mem. Op. Den. Pet'r's Mot. J. Pleadings [160].
[16] *Id. See* 28 U.S.C. § 2255(f)(3).
[17] *See* Ct's Mem. Op. Den. Pet'r's Mot. J. Pleadings [160].
[18] *Id.*

opportunity to prove his actual innocence of aiding and abetting in honest services fraud as that crime is now defined by *Skilling*, to test the evidence and the credibility of the witnesses, and to admit or deny the correctness of the Government's exhibits and the *Langston* court file.[19]

## B.  Standard of Review

"Habeas review is an extraordinary remedy and will not be allowed to do service for an appeal." *Bousley v. United States*, 523 U.S. 614, 621, 118 S. Ct. 1604, 140 L. Ed. 2d 828 (1998) (internal quotation marks and citations omitted).  The Supreme Court has "strictly limited the circumstances under which a guilty plea may be attacked on collateral review." *Id.*, 118 S. Ct. 1604.  "Indeed, the concern with finality served by the limitation on collateral attack has special force with respect to convictions based on guilty pleas." *Id.*, 118 S. Ct. 1604 (internal quotation marks and citation omitted).

The Petitioner procedurally defaulted on his "actual innocence" claim by filing no direct appeal of his conviction or sentence.  In order to overcome procedural default and prevail on a motion to set aside his conviction pursuant to § 2255, the Petitioner must prove his "actual innocence" of the crime to which he pled guilty, as well as the charges dismissed in the original indictment. *Id.* at 624, 118 S. Ct. 1604.  The Petitioner's burden is substantial.  "To establish actual innocence, [a] petitioner must demonstrate that, in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him." *Id.* at 623, 118 S. Ct. 1604 (citing *Schlup v. Delo*, 513 U.S. 298, 327–28, 115 S. Ct. 851, 130 L. Ed. 2d 808 (1995) (quoting Friendly, *Is Innocence Irrelevant? Collateral Attack on Criminal Judgments*, 38 U. CHI. L. REV. 142, 160 (1970) (internal quotation marks omitted)).  The actual innocence standard "does not merely require a showing that a reasonable doubt exists in the light of the new evidence, but

---

[19] *Id.*

rather that <u>no</u> reasonable juror would have found the defendant guilty." *Schlup*, 513 U.S. at 329,

115 S. Ct. 85 (emphasis added); *see Bosley v. Cain*, 409 F.3d 657, 664 (5th Cir. 2005) (per

curiam), *cert. denied*, 547 U.S. 1208, 126 S. Ct. 2887, 165 L. Ed. 2d 920 (2006). The standard is

not satisfied where at least one juror, acting reasonably and properly instructed, would vote to

convict the petitioner. *Schlup*, 513 U.S. at 329, 115 S. Ct. 851; *Bosley*, 409 F.3d at 665.

> "[A]ctual innocence" means factual innocence, not mere legal
> insufficiency. In other words, the Government is not limited to the
> existing record to rebut any showing that petitioner might make.
> Rather, . . . the Government should be permitted to present any
> admissible evidence of petitioner's guilt even if that evidence was
> not presented during petitioner's plea colloquy and would not
> normally have been offered . . . . In cases where the Government
> has forgone more serious charges in the course of plea bargaining,
> petitioner's showing of actual innocence must also extend to those
> charges.

*Bousley*, 523 U.S. at 623–24, 118 S. Ct. 1604 (internal citation and footnote omitted).

"A district court, in making its assessment of a petitioner's showing, is not bound by the

rules of evidence that govern a trial[.]" *Bosley*, 409 F.3d at 662 (quoting *Schlup*, 513 U.S. at

324, 328, 115 S. Ct. 851). The court makes its determination based on the total record, that is,

"all the evidence, old and new, incriminating and exculpatory, without regard to whether it

would necessarily be admitted under rules of admissibility that would govern at trial." *Moore v.*

*Quarterman*, 534 F.3d 454, 464 n.14 (5th Cir. 2008) (quoting *House v. Bell,* 547 U.S. 518, 537–

38, 126 S. Ct. 2064, 165 L. Ed. 2d 1 (2006) (internal citations and quotations omitted)). *See also*

*Bosley*, 409 F.3d at 662 (habeas court considers all evidence, "including that alleged to have

been illegally admitted . . . and evidence tenably claimed to have been wrongly excluded or to

have become available only after the trial"); *Moore*, 534 F.3d at 464 n.18 (quoting *Schlup*, 513

U.S. at 327–28, 115 S. Ct. 851 (internal citations and quotations omitted) ("In assessing the

6

adequacy of petitioner's showing . . . the district court is not bound by the rules of admissibility that would govern at trial," but "the court is permitted to consider the unreliability of the proffered evidence.")). Based on the record, "the court must make a probabilistic determination about what reasonable, properly instructed jurors would do. The court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors." *Moore*, 534 F.3d at 464 n.14 (quoting *House*, 547 U.S. at 537–38, 126 S. Ct. 2064). "[T]he analysis must incorporate the understanding that proof beyond a reasonable doubt marks the legal boundary between guilt and innocence." *Schlup*, 513 U.S. at 328, 115 S. Ct. 851. "The word 'reasonable' . . . is not without meaning. It must be presumed that a reasonable juror would consider fairly all of the evidence presented. It must also be presumed that such juror would conscientiously obey the instructions of the trial court requiring proof beyond a reasonable doubt." *Id.* at 329, 115 S. Ct. 851. "At the same time, though, the *Schlup* standard does not require absolute certainty about the petitioner's guilt or innocence." *House*, 547 U.S. at 537–38, 126 S. Ct. 2064. "[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of all of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 329, 115 S. Ct. 851.

## C. Jurisdiction

The Petitioner argues that he pled guilty to an information that failed to charge a crime, and thus that the Court should vacate his conviction because it does not have jurisdiction. The Court rejects the Petitioner's argument that the Court lacks jurisdiction. The Petitioner relies on *United States v. Meacham*, 626 F.2d 503, 509–10 (5th Cir. 1980), where the defendant was charged with "conspiring to attempt to violate" the Controlled Substances Act, a non-existent

7

crime. However, in the case *sub judice*, the Petitioner pled guilty to aiding and abetting honest services fraud, a crime that is cognizable under the authority of the United States and within the jurisdiction of this Court. Intervening law confines the reach of the honest services statute (18 U.S.C. § 1346) to "paradigmatic cases of bribes and kickbacks." *Skilling*, 130 S. Ct. at 2932–2933. Pursuant to *Bousley*, a petitioner who claims the benefit of intervening law may only have his claim reviewed after overcoming procedural default.

The Petitioner is really arguing that he cannot be guilty of the crime to which he pled because the facts are insufficient to warrant a conviction under *Skilling*. This argument fails to raise a jurisdictional challenge.

In *United States v. Cotton*, the Supreme Court held that "a district court 'has jurisdiction of all crimes cognizable under the authority of the United States . . . [and] [t]he objection that the indictment does not charge a crime against the United States goes only to the merits of the case." 535 U.S. 625, 630–31, 122 S. Ct. 1781, 152 L. Ed. 2d 860 (2002) (citing *Lamar v. United States*, 240 U.S. 60, 65, 36 S. Ct. 255, 60 L. Ed. 526 (1916)). The Fifth Circuit, accordingly, has stated: "After *Cotton*, any objection that the indictment fails to charge a crime against the United States does not contest jurisdiction, but goes only to the merits of the case brought against the Defendant." *United States v. Jacquez-Beltran*, 326 F.3d 661, 662 (5th Cir. 2003). Several Fifth Circuit cases state that a defect in a plea is not jurisdictional "where intervening law has established that a defendant's actions do not constitute a crime and thus that the defendant is actually innocent of the charged offense." *United States v. Wainuskis*, 138 F.3d 183, 185 (5th Cir. 1998); *United States v. Foster*, 154 F.3d 416, 1998 WL 526627, at *2 (5th Cir. 1998) (per curiam); *United States v. Andrade*, 83 F.3d 729, 731 (5th Cir. 1996). For the foregoing reasons, the Court finds that the Petitioner's jurisdictional argument is without merit.

8

## D. Discussion

In reaching its decision, the Court has had to determine whether the Petitioner has demonstrated he is actually innocent of honest services fraud, the crime to which he pled guilty, because his conduct did not constitute a paradigmatic bribe or a kickback, as required by *Skilling*. For the following reasoning, the Court finds that the Petitioner's conduct constituted a paradigmatic bribe, that he is not actually innocent of the crime charged, and that his conviction must thus be sustained.

### 1. *Skilling* and Paradigmatic Bribery

In *Skilling,* the Supreme Court stated that "honest services fraud does not encompass conduct more wide-ranging than the paradigmatic cases of bribes and kickbacks." *Skilling*, 130 S. Ct. at 2932–2933. Honest services fraud by bribery requires a *quid pro quo*—i.e., specific intent to give or receive something of value in exchange for an official act. The Supreme Court in *Skilling* stated that the honest services statute "draws content" from federal statutes proscribing similar crimes, and the Court referenced 18 U.S.C. § 201(b) (bribery of a federal public official) and 18 U.S.C. § 666(a)(2) (federal programs bribery). The Court favorably cited three circuit court decisions holding that an honest services fraud conviction requires proof of a *quid pro quo*: *United States v. Whitfield*, 590 F.3d 325, 352–53 (5th Cir. 2009); *United States v. Ganim*, 510 F.3d 134, 147–49 (2d Cir. 2007); and *United States v. Kemp*, 500 F.3d 257, 281–86 (3d Cir. 2007).

In *Kemp*, the Third Circuit stated that "evidence of a *quid pro quo* can be implicit, that is, a conviction can occur if the Government shows that [a public official] accepted payments or other consideration with the implied understanding that he would perform or not perform an act in his official capacity." 500 F.3d at 284. "[T]he official and payor need not state the *quid pro*

9

*quo* in express terms, for otherwise the law's effect could be frustrated by knowing winks and nods." *Id.* (citing *Evans v. United States*, 504 U.S. 255, 274, 112 S. Ct. 1881, 119 L. Ed. 2d 57 (1992) (Kennedy, J., concurring)). "While the form and number of gifts may vary, the gifts still constitute a bribe as long as the essential intent—a specific intent to give or receive something of value in exchange for an official act—exists." *Id.*, 112 S. Ct. 1181.

In *Whitfield*, the Fifth Circuit held that "the government does not have to prove an explicit promise to perform a particular act made at the time of payment. Rather, it is sufficient if the public official understands that he or she is expected as a result of the payment to exercise particular kinds of influence . . . as specific opportunities arise." 590 F.3d at 349. "The law only requires that the Government prove the 'specific intent to give or receive something of value in exchange for an official act' to be performed sometime in the future." *Id.* at 353.

Bribery does not require a financial *quid*, and the fact that bribery does not involve a financial *quid* does not make it non-paradigmatic. Both federal bribery statutes recognized in *Skilling*, 18 U.S.C. §§ 201(b) and 666(a)(2), criminalize giving or offering "anything of value." The term "anything of value" is "broad in scope and contains no language restricting its application to transactions involving money, goods, or services." *United States v. Marmolejo*, 89 F.3d 1185, 1191 (5th Cir. 1996). "[T]he plain meaning compels" the conclusion that the term includes "transactions involving intangible items." *Id.* This broad interpretation is based upon the recognition that monetary worth is not the sole measure of value. *United States v. Nilsen*, 967 F.2d 539, 542-43 (11th Cir. 1992), *cert. denied*, 507 U.S. 1034 (1993). "The phrase 'anything of value' in bribery and related statutes has consistently been given a broad meaning to carry out the congressional purpose of punishing misuse of public office. Corruption of office occurs when the officeholder agrees to misuse his office in the expectation of gain, whether or

10

not he has correctly assessed the worth of the bribe." *United States v. Williams*, 705 F.2d 603, 623 (2d Cir. 1983). "[T]he requirement of value is satisfied if the thing has sufficient value in the mind of the person concerned so that his actions are influenced." *McDonald v. State*, 329 So. 2d 583, 587–88 (Ala. App. 1975), *cert. denied*, 429 U.S. 834 (1976) (cited favorably in *Marmolejo*). The test of value is whether the recipient subjectively attaches value to the thing received. *United States v. Picquet*, 963 F.2d 54, 55 (5th Cir. 1992). In decisions cited favorably by the Fifth Circuit, courts have found that the following constitute "anything of value": a witness's testimony, even though it was not needed after the defendant pled guilty, *Nilsen*, 967 F.2d at 543; stock that had no commercial value, *United States v. Williams*, 705 F.2d 603, 622– 23 (2d Cir. 1983); as well as information, amusement, sexual intercourse, the promise of sexual intercourse, a promise to reinstate an employee, and an agreement not to run in a primary election, *United States v. Girard*, 601 F.2d 69, 71 (2d Cir. 1979), *cert. denied*, 444 U.S. 871 (1979). In an honest services fraud by bribery case post-*Skilling*, the Fifth Circuit affirmed the conviction of a state court judge who used his position to obtain sexual favors in exchange for assisting a criminal defendant. *See United States v. Barraza,* 655 F.3d 375 (5th Cir. 2011).

## 2. Application of the Actual Innocence Standard

The Court has made a probabilistic assessment of what properly instructed, reasonable jurors would conclude after hearing the evidence in the supplemented record, and finds that at least one reasonable, properly instructed juror would find that the Petitioner is guilty of aiding and abetting in honest services fraud by bribery beyond a reasonable doubt. There is adequate credible evidence in the record supporting at least one reasonable juror's finding that the Petitioner, with corrupt intent, exploited Judge DeLaughter's known ambitions to become a federal judge by offering to use his relationship as brother-in-law to then-United States Senator

11

Trent Lott to help DeLaughter receive consideration for a federal judgeship. At least one reasonable, properly instructed juror would find that, in exchange for the Petitioner's promise to use his influence as brother-in-law to then-Senator Lott to further DeLaughter's ambitions, DeLaughter gave the Petitioner favorable treatment in the *Wilson* case that included advance notice of DeLaughter's thoughts on the issues in the case, opportunities to revise the Petitioner's arguments in accordance with DeLaughter's thoughts, and advance notice of how DeLaughter was going to rule. At least one reasonable, properly instructed juror would find that it was not only Ed Peter's close relationship that caused DeLaughter to give the Petitioner favorable treatment in the *Wilson* case, but also the Petitioner's offer to use his familial relationship with then-Senator Lott to advance DeLaughter's ambitions in securing a federal judgeship, that caused the Petitioner to receive favorable treatment. Indeed, Petitioner agreed when he pled guilty that the corruption scheme included both hiring Peters and contacting Lott. At least one reasonable, properly instructed juror would find that the Petitioner's offer to use his influence with then-Senator Lott, whether that influence was actual or merely perceived, was something of value to then-Judge DeLaughter, considering that then-Senator Lott was one of two United States Senators in Mississippi at the time, and United States Senators recommend candidates for federal district court judgeships to the President. At least one reasonable, properly instructed juror also would conclude that the Petitioner's offer to approach then-Senator Lott about DeLaughter's interest in a federal judgeship was something of value to DeLaughter, considering that then-Senator Lott, at the Petitioner's request, called DeLaughter regarding his interest in a federal judgeship and acknowledged that the Petitioner had recommended DeLaughter.

The Court's finding that the Petitioner has failed to establish actual innocence is supported by the following findings and conclusions:

12

1.    The Petitioner's Plea Colloquy: The Petitioner's admissions under oath at his plea colloquy all constitute pieces of the bribery puzzle. The Petitioner admitted under oath at his February 10, 2009 plea colloquy that his legal team, consisting of Joseph C. Langston, Tim Balducci, non-lawyer Steven Patterson, and Ed Peters aided and abetted and devised a scheme to "corruptly influence" then-Judge DeLaughter "to ensure that Scruggs enjoyed an unlawful advantage in secret and unknown to the plaintiffs" in the *Wilson* case.[20]  The Petitioner further admitted that the scheme occurred from on or about July 2005 until on or about October 2007.[21] The Petitioner admitted that he hired Langston in the summer of 2005 to take over the lead as chief counsel in the *Wilson* case,[22] which had been pending for almost a decade. The Petitioner also admitted that Langston, Balducci, and Patterson met with former district attorney Peters, believing that Peters had the kind of personal relationship with then-Judge DeLaughter that would enable the Scruggs legal team to receive *ex parte* access to the court. The Petitioner admitted that he hired Peters, not for the purpose of entering an appearance as an attorney in the case, but rather to corruptly influence DeLaughter behind the scenes. The Petitioner admitted that the scheme involved exploiting two of Judge DeLaughter's vulnerabilities:

> First, his close association with former district attorney Ed Peters, and, second, his known ambition to become a federal judge.
> Langston, Balducci, and Patterson paid Ed Peters $50,000 cash, and Langston later paid Peters an additional $950,000, all for the purpose of using Ed Peters to influence [DeLaughter].
>
> Additionally, Richard F. "Dickie" Scruggs contacted his brother-in-law [Trent Lott], then a United States Senator from Mississippi, to recommend [DeLaughter] for consideration for a federal district judgeship then open in the Southern District of Mississippi.  All of

---

[20] Pet'r's Plea Colloquy [23]; Information, Pet'r's Ex. 33.
[21] Information, Petr's Ex. 33
[22] Information, Petr's Ex. 33.

this occurred as the *Wilson v. Scruggs* case gained intensity and proceeded to a final resolution in [DeLaughter]'s court.[23]

The Petitioner admitted that DeLaughter received a call from then-Senator Lott and knew that Scruggs had recommended him. The Petitioner admitted that the *Wilson* case was ultimately resolved in a favorable way to him. The Petitioner further admitted to using the U.S. Mail in executing the scheme.

By his plea, the Petitioner admitted that he used DeLaughter's "known ambition to become a federal judge" to corrupt the judge, and that recommending DeLaughter to his brother-in-law, then-Senator Trent Lott, was part of the scheme to corrupt DeLaughter.

2.    Langston's Plea Colloquy: Roughly a month before the Petitioner's plea, Langston, the Petitioner's lead counsel in the *Wilson* case, waived indictment and pled guilty to an information charging that, from on or about January of 2006 and continuing until on about March of 2007, he conspired with Scruggs, Patterson, and unnamed others, to commit federal programs bribery (18 U.S.C. §§ 2, 666(a)(2)(b)).[24] The information to which Langston pled states:

> 2.    It was part of the conspiracy for JOSEPH C. LANGSTON and his co-conspirators to attempt to influence state Circuit Court Judge Robert "Bobby" DeLaughter by providing a thing of value, that is, favorable consideration of Robert "Bobby" DeLaughter for appointment to the federal district court bench in the Southern Judicial District of Mississippi, to obtain rulings in favor of Richard "Dickie" Scruggs in the lawsuit styled *Wilson v. Scruggs* pending before Judge DeLaughter.
>
> . . .
>
> 4.    It was further part of the conspiracy that Richard "Dickie" Scruggs told JOSEPH C. LANGSTON that he could arrange for Robert "Bobby" DeLaughter to be considered for a U.S. District

---

[23] Pet'r's Plea Colloquy [126-5] at 6–7.
[24] *See* Information, [3] in 1:08-CR-00003.

Judge appointment and that Langston should convey that information through his co-conspirators to Judge DeLaughter.

5.     It was further part of the conspiracy that between late February 2006 and March 30, 2006, that the consideration for United States judgeship was communicated to Robert "Bobby" DeLaughter during the pendency of the case of *Wilson v. Scruggs* in which Judge Robert "Bobby" DeLaughter was the presiding judge.

### Overt Acts

During and in furtherance of the conspiracy and to promote and accomplish its objectives, the co-conspirators committed certain overt act, among which were the following:

1.     On or about January 2006, JOSEPH C. LANGSTON and Timothy R. Balducci entered appearance as attorneys for Richard "Dickie" Scruggs in the case of *Wilson v. Scruggs*, a lawsuit involving a dispute concerning the division of attorneys fees and a case that was assigned to state Circuit Court Judge Robert "Bobby" DeLaughter.

2.     Between January 2006 and March of 2006, JOSEPH C. LANGSTON, Timothy R. Balducci[,] and Steven A. Patterson traveled from the Northern District of Mississippi to Jackson, Mississippi, to meet with a close personal friend of Robert "Bobby" DeLaughter.

3.     On or about December 2005, JOSEPH C. LANGSTON and Steven A. Patterson delivered $50,000 in cash to the close personal friend of Judge Robert "Bobby" DeLaughter, for the purpose of retaining the close personal friend [Ed Peters] to influence Judge Robert "Bobby" DeLaughter.

4.     On or about February 2006, Richard "Dickie" Scruggs agreed with JOSEPH C. LANGSTON and other co-conspirators that if the *Wilson v. Scruggs* case was resolved in his favor that Langston, Patterson[,] and [Ed Peters] would split the savings to Scruggs as a result of a resolution of the case in favor of Scruggs.

5.     Between on or about July of 2006 and July of 2007, JOSEPH C. LANGSTON, Steven A. Patterson[,] and [Ed Peters] split $3,000,000, representing the savings to Scruggs as a result of

rulings in favor of Scruggs by Judge DeLaughter resulting in a settlement of the case.[25]

Langston admitted at his plea colloquy under oath that "[d]uring the course of the [*Wilson*] litigation, [he] and Scruggs were . . . aware that Judge DeLaughter was interested in a position as a federal judge. Based on this knowledge, Scruggs told Langston to let [DeLaughter] know that if he ruled in [Scruggs'] favor, [Scruggs] would pass his name along for consideration regarding the federal judgeship. Langston then informed Peters, who, in turn, passed the information along to Judge DeLaughter."[26] Langston admitted that, "in fact, DeLaughter's name was submitted for consideration for a federal judgeship, and DeLaughter was so notified."[27]

At the Petitioner's evidentiary hearing, Langston's testimony completely contradicted his plea to bribery and also his testimony before the grand jury.[28] Langston admitted when he pled guilty in 2009 to conspiring to bribe DeLaughter "by providing a thing of value, that is, favorable consideration of Robert 'Bobby' DeLaughter for appointment to the federal district court bench in the Southern Judicial District of Mississippi, to obtain rulings in favor of Richard 'Dickie' Scruggs in the lawsuit styled *Wilson v. Scruggs* pending before Judge DeLaughter." Yet, when asked at the Petitioner's evidentiary hearing whether there was a bribe, Langston testified, "I don't know of a bribe. I'm not aware of a bribe. Obviously, I'm aware of the matter of his interest in a federal judgeship, but we didn't offer him that."[29] Langston specifically agreed at

---

[25] *See* Information, [3] in 1:08-CR-00003, at 1–3. The Court notes that Patterson testified that he received no money as a result of the reverse contingency fee.

[26] Langston's Plea Colloquy, [47] in 1:08-CR-00003, at 17–18.

[27] *Id.* at 18.

[28] Although the Fifth Circuit's decision in *United States v. Whitfield*, 590 F.3d 325 (5th Cir. 2009), decided subsequent to Langston's plea, clarified the jurisdictional reach of Section 666 and found that it cannot reach bribes to state court judges acting in their judicial role, *Whitfield* does not change the fact that Langston pled guilty to the same elements of bribery as those elements required for honest services fraud. The Supreme Court in *Skilling* stated that the honest services statute "draws content" from federal statutes proscribing similar crimes, and the Court referenced 18 U.S.C. § 666(a)(2) (federal programs bribery).

[29] Evidentiary Hr'g at 81–82.

his plea colloquy that the bribe entailed communicating to DeLaughter that the Petitioner "could arrange for Robert 'Bobby' DeLaughter to be considered for a U.S. District Judge appointment." But at the Petitioner's evidentiary hearing, Langston testified: "If you're asking did we give him anything, the answer is no, we didn't. I mean, whatever influence we had with him, I think whether you try to dress it up and call it goodwill or whatever we were trying to gain, that came through Ed Peters, because Bobby DeLaughter didn't know me."[30] The Court finds that the foregoing portions of Langston's testimony at the evidentiary hearing, which conflict with the facts upon which Langston pled and his grand jury testimony, are not credible.

3. DeLaughter's Plea Colloquy: On July 30, 2009, Bobby DeLaughter pled guilty to obstructing, influencing, or impeding an official proceeding in violation of 18 U.S.C. § 1512(c)(2). DeLaughter agreed at his plea colloquy that while being interviewed by the FBI during its investigation into the *Wilson* matter, he stated that he

> "never spoke to Ed Peters regarding . . . ." substantive issues related to the case of *Wilson v. Scruggs*, at a time when said case was pending in his court, when in truth and fact [DeLaughter] had corruptly discussed with Ed Peters substantive issues in the *Wilson v. Scruggs* case on numerous occasions and knew Peters was secretly acting on behalf of Scruggs' lawyers in an attempt to gain favorable rulings for Scruggs, at a time when Peters was not counsel of record . . . .[31]

DeLaughter admitted that his statements to the FBI were "done knowingly and dishonestly with the intent to obstruct, influence[,] or impede the investigation."[32] DeLaughter denied the other four counts of the indictment which charged conspiracy to commit federal programs bribery (18

---

[30] *Id.* at 81.

[31] *See* DeLaughter's Indictment, Count Five, Pet'r's Ex. 34.

[32] DeLaughter Plea Colloquy [98] at 24.

U.S.C. § 666) and three counts of aiding and abetting in honest services fraud (18 U.S.C. §§ 2, 1341, and 1346).[33]

DeLaughter, by his plea, denied being involved in a bribery scheme. He told the FBI that when Peters relayed Langston's offer to help him obtain a federal judgeship, "[DeLaughter] instructed Peters to 'make damn sure to them that there would be no *quid pro quo*,' " and that he would not show favoritism.[34] However, DeLaughter's plea and statement regarding the absence of a *quid pro quo* do not establish that there was no *quid pro quo*. DeLaughter's conviction itself resulted from DeLaughter's false statements to the FBI about his contacts with Peters. Although DeLaughter also stated to the FBI that he would not show favoritism to the Petitioner, the record establishes that DeLaughter did, indeed, show favoritism to the Petitioner. Additionally, DeLaughter told the FBI that "he [did] not remember making suggestions to any of the advance copies of the motions."[35] This statement contradicts the testimonies of Peters, Langston, and Balducci. For these reasons, the Court questions DeLaughter's credibility and finds that DeLaughter's denial of the existence of a bribery scheme is not helpful in its analysis.

4.    The Remaining Supplemented Record

In July or August 2005, the Petitioner promoted Joseph Langston to lead counsel in the *Wilson* case, which had been pending for more a decade in the Circuit Court of Hinds County. The Petitioner was sued by Wilson in a dispute over the division of attorneys' fees earned in asbestos cases, and the Petitioner's potential exposure was millions of dollars. Langston's promotion occurred shortly after a $17 million dollar judgment[36] had been assessed against the

---

[33] *Id.* at 22–24.
[34] DeLaughter 302, 12/10/2007, at 3.
[35] *Id.*
[36] Evidentiary Hr'g at 94.

Petitioner following arbitration in a case wherein the Petitioner's former colleague, Alwyn H. Luckey, sued the Petitioner over the division of attorney fees from asbestos litigation.

The same lawyers were involved in both *Wilson* and *Luckey*.[37] The Petitioner was angry about the outcome of *Luckey* and wanted to terminate the lawyers who had recommended arbitration.[38] Langston and his chief assistant at the Langston Firm, lawyer Timothy Balducci, had advocated for trial.[39] The Petitioner wanted to ensure that *Wilson* would not have the same ending as *Luckey*.[40] The Petitioner agreed at Langston's urging not to terminate the other lawyers involved, and instead made Langston lead counsel in *Wilson*.[41]

In the fall of 2006,[42] the Petitioner was advised by a Jackson, Mississippi lawyer "that if you have a case pending before Bobby DeLaughter in Hinds County . . . it [is] beneficial to you to associate Ed Peters."[43] The Petitioner relayed this information to Langston, who in turn passed the information along to Balducci and Steve Patterson, a non-lawyer consultant who worked out of the Langston Law Firm.[44] Patterson knew Peters socially, as well as from Patterson's days as a Mississippi state auditor and Democratic Party Chairman when Peters was Hinds County's district attorney.[45] Patterson agreed that it would be wise to associate Peters in a

---

[37] Balducci Dep. [135-4] at 14–15.

[38] Langston Grand Jury Test. [135-1] at 7, 33–34; Evidentiary Hr'g at 62, 93–94. The Court also notes that Balducci testified before the grand jury that Scruggs referred to one of Wilson's attorneys, Charlie Merkel, as a "junkyard dog" and that "you had to have a bigger dog" and "take him off the chain to fight a junkyard dog like Merkel." Balducci Grand Jury Test. at 95–96. According to Balducci, Scruggs further stated that Scruggs' lead counsel in the *Luckey* case, Jack Dunbar, was "an old lady" who "didn't have the stomach" to do "what needed to be done in the *Wilson* case." *Id.*

[39] Langston Grand Jury Test. [135-1] at 33–34; Evidentiary Hr'g at 61–62.

[40] Evidentiary Hr'g at 94.

[41] Langston Grand Jury Test. [135-1] at 7, 34.

[42] Evidentiary Hr'g at 63.

[43] Langston Grand Jury Test. [135-1] at 9–10.

[44] Langston Grand Jury Test. [135-1] at 8, 10; Patterson Dep. [135-5] at 10–11 ("Mr. Scruggs, I think, thought that Mr. Peters would be a great consultant on that case . . . ." "Mr. Langston wanted to get Peters involved because Mr. Scruggs had asked him to get him."); Evidentiary Hr'g at 63.

[45] Peters Grand Jury Test. [135-2] at 4; Peters 302, 12/18/07, at 1; Langston Grand Jury Test. [135-1] at 10; Patterson Dep. [135-5] at 5, 10; Evidentiary Hr'g at 63, 106–08.

case pending before DeLaughter, because Peters and DeLaughter were close friends and had a special relationship.[46] The Petitioner was worried that Wilson's lawyer, Bill Kirksey—who was DeLaughter's former law partner—would garner special treatment for Wilson in the case and obtain *ex parte* access to DeLaughter.[47] The Petitioner, Langston, and Patterson wanted to associate Peters, because they believed that Peters could neutralize any influence Kirksey would have over DeLaughter.[48]

Peters characterized his relationship with DeLaughter as "[e]xtremely close. Probably like a father, son."[49] DeLaughter told the FBI that his relationship with Peters was akin to "an older brother and father figure," and that the two "would do anything for each other."[50] Peters and DeLaughter had worked together for years. Peters was a district attorney in several counties in the Jackson, Mississippi area, including Hinds County, for approximately thirty-two years.[51] DeLaughter worked for Peters as an assistant district attorney for about fifteen years.[52] The two tried several high-profile cases together, including the prosecution of Byron De La Beckwith for the murder of civil rights leader Medgar Evers.[53] Peters and DeLaughter were also political allies.[54] Peters had a strong political presence in Hinds County, and DeLaughter depended on Peters to further DeLaughter's political and legal aspirations.[55] When DeLaughter left the

---

[46] Langston Grand Jury Test. [135-1] at 10; Patterson Dep. [135-5] at 18; Evidentiary Hr'g at 64, 68.

[47] Evidentiary Hr'g at 109–10. DeLaughter testified at his plea colloquy that he worked at a firm with Kirksey from 1983 until 1987. Petr's Ex. 42 at 5.

[48] Evidentiary Hr'g at 67, 110–11.

[49] Peters Grand Jury Test. [135-2] at 3.

[50] DeLaughter 302, 1/02/2008, at 1.

[51] Peters Grand Jury Test. [135-2] at 2; Langston Grand Jury Test. [135-1] at 10; Patterson Dep. [135-5] at 16, 37.

[52] Peters Grand Jury Test. [135-2] at 3, Langston Grand Jury Test. [135-1] at 11; Patterson Dep. [135-5] at 10, 15; DeLaughter 302, 1/02/2008, at 1. DeLaughter testified at his plea colloquy that he worked as an assistant district attorney for Peters from May of 1987 until December of 1999. Pet'r's Ex. 42 at 5.

[53] Peters Grand Jury Test. [135-2] at 3; Patterson Dep. [135-5] at 10–11; DeLaughter 302, 1/02/2008, at 1.

[54] Langston Grand Jury Test. [135-1] at 23; Patterson Dep. [135-5] at 10.

[55] Langston Grand Jury Test. [135-1] at 23; Evidentiary Hr'g at 109.

district attorney's office to pursue becoming a judge, Peters helped DeLaughter secure his appointment to a county judgeship.[56] Peters then helped DeLaughter become elected as a circuit court judge.[57] Peters also helped raise funds for DeLaughter's re-election.[58]

Unquestionably, Langston and Patterson were aware of how close Peters' relationship with DeLaughter was.[59] Patterson called Peters and told him that Patterson and Langston had plans to travel to Jackson, Mississippi, and would like to meet with Peters at the airport to discuss Peters' taking a role in the *Wilson* case.[60] Peters was willing to meet with Langston and Patterson.[61]

First Meeting: Langston and Patterson (and, perhaps, Balducci) flew to Jackson, Mississippi, to meet with Peters the first time about the *Wilson* case.[62] Langston and Patterson met in a conference room at the airport, and there Patterson introduced Langston to Peters.[63] Patterson and Langston told Peters that they were representing the Petitioner in a lawsuit filed by Robert Wilson and that a federal magistrate judge had recently ruled against the Petitioner in a similar, but separate, case that resulted in arbitration.[64] They advised that Langston was taking over as lead counsel for the Petitioner in *Wilson* and communicated their fear that Wilson's

---

[56] Peters 302, 12/18/07, at 2; Langston Grand Jury Test. [135-1] at 11; Evidentiary Hr'g at 115. DeLaughter testified at his plea colloquy that he was appointed to fill a vacancy on the county court bench in December 1999 and appointed in June of 2002 to fill a vacancy in Hinds County Circuit Court. Pet'r's Ex. 42 at 5. DeLaughter inherited the *Wilson* case when he became a circuit court judge. DeLaughter 302, 12/21/2007, at 2.
[57] Peters 302, 12/18/07, at 2; Evidentiary Hr'g at 115. DeLaughter's 302 states that DeLaughter won the election to retain his seat on the Hinds County Circuit Court in 2002. *See* DeLaughter 302, 12/21/2007, at 1–2.
[58] Evidentiary Hr'g at 110.
[59] Langston Grand Jury Test. [135-1] at 23; Patterson Dep. [135-5] at 18, 23; Evidentiary Hr'g at 109–10.
[60] Peters Grand Jury Test. [135-2] at 3; Peters 302, 12/19/07, at 1; Langston Grand Jury Test. [135-1] at 11; Patterson Dep. [135-5] at 12; Evidentiary Hr'g at 64.
[61] Patterson Dep. [135-5] at 13.
[62] *Id.* at 19–21; *see* Peters 302.
[63] Patterson Dep. [135-5] at 20, 32; Evidentiary Hr'g at 113.
[64] Peters 302, 12/18/07, at 2; Patterson Dep. [135-5] at 21.

counsel, Kirksey, would get "home cooking" in *Wilson*.[65]   They asked Peters whether DeLaughter would favor the Wilson side of the case due to DeLaughter's relationship with Wilson's lawyer, Kirksey.[66]   Peters assured Langston and Patterson that DeLaughter would not favor Wilson and would would follow the law.[67]   Peters advised that DeLaughter did not care for Kirksey.[68]   Peters testified before the grand jury: "They said rather than me just telling them that would I check with the judge and make sure there wouldn't be any influence."[69]

Therefore, Peters contacted DeLaughter.  DeLaughter assured Peters "that nothing that Kirksey would do on the other side would influence him particularly."[70]   DeLaughter told the FBI that this contact by Peters occurred "just before Scruggs filed a motion for partial summary judgment."[71]   Peters told DeLaughter that Langston was taking over representing the Petitioner in the *Wilson* case, Peters was helping Langston, and Peters might become more involved in the case at a later date.[72]

Prior to the second meeting among Langston, Patterson, and Peters, Peters conveyed to Patterson or Langston that he could not attend a meeting with them because he was meeting with someone else who might be able to help DeLaughter become a federal judge.[73]   At this time, Peters was trying to help DeLaughter secure a federal magistrate judge position.[74]   Langston passed on this information to the Petitioner.

---

[65] Peters 302, 12/18/07, at 2.
[66] Peters Grand Jury Test. [135-2] at 8.
[67] *Id.*; Evidentiary Hr'g at 117–18.
[68] Peters 302, 12/18/07, at 2.
[69] Peters Grand Jury Test. [135-2] at 8.
[70] Peters Grand Jury Test. [135-2] at 8, 12–13; Peters 302, 12/18/2007, at 2; DeLaughter 302, 12/10/2007, at 3.
[71] DeLaughter 302, 12/21/2007, at 2.
[72] DeLaughter 302, 12/21/2007, at 2.
[73] Peters 302, 9/9/08, at 3; Evidentiary Hr'g at 115; Langston Grand Jury Test. [135-1] at 25.
[74] DeLaughter 302, 12/10/07, at 3; DeLaughter 302, 12/21/2007, 3; Peters 302, 12/18/2007.

All this time, it was widely known that the Petitioner's brother-in-law was Trent Lott, one of two United States Senators representing Mississippi.[75]

Langston asked Patterson about paying Peters prior to the second trip to Jackson to meet Peters, and Patterson suggested to Langston that they pay Peters $50,000 in cash to associate him in the *Wilson* case.[76] Patterson had already discussed with Peters that he could make a substantial fee, perhaps as much as $50,000, to associate on the case, and that he could probably arrange for Peters to be paid in cash.[77] Balducci had $50,000 in cash and provided the cash to Langston to pay Peters.[78] Langston later reimbursed Balducci.[79]

Second Meeting: At least one week after their first meeting with Peters in Jackson, Langston, Patterson, and Balducci again flew to Jackson to meet with Peters at the airport.[80] Langston testified that Balducci was in and out of the meeting; Balducci testified that he sat in the lobby and did not attend the meeting with Peters.[81] Peters told the Petitioner's team that he had met with DeLaughter and that "there would not be any influence" relating to Kirksey.[82] During the meeting, Langston passed an envelope to Peters and stated: "[T]hat's $50,000 cash and there won't be any 1099 on that."[83] The Petitioner knew that Peters had been hired, and the

---

[75] Langston Grand Jury Test. [135-1] at 24–26.

[76] *Id.* at 11; Evidentiary Hr'g at 133.

[77] Patterson Dep. [135-5] at 19, 26; Evidentiary Hr'g at 65, 113.

[78] Langston Grand Jury Test. [135-1] at 12; Patterson Dep. [135-5] at 27; Evidentiary Hr'g at 65, 113–14.

[79] Langston Grand Jury Test. [135-1] at 12; Patterson Dep. [135-5] at 27.

[80] Peters 302, 12/19/07, at 2–3; Patterson Dep. [135-5] at 24-25, 32; Evidentiary Hr'g at 65.

[81] Evidentiary Hr'g at 65–66, 133–34.

[82] Peters Grand Jury Test. [135-2] at 9.

[83] *Id.*; Peters 302, 12/18/07, at 2.; Patterson Dep. [135-5] at 28. At the evidentiary hearing, Langston testified that he did not remember making this statement, but he acknowledged that there was no 1099 on the money paid to Peters. Evidentiary Hr'g at 95.

Petitioner also knew that Peters had been paid $50,000, because Langston had told him.[84] Langston kept the Petitioner abreast of all significant occurrences in the *Wilson* case.[85]

Interestingly, Langston asked Peters to represent the Petitioner's interest in the *Wilson* case, but not to make an entry of appearance.[86] Langston, Peters, and Balducci testified that the Scruggs team feared that if Peters entered an appearance in the case, Wilson would seek to recuse DeLaughter, due to Peters' relationship with DeLaughter.[87] Before the grand jury, Langston testified that Peters' lack of an official appearance in the case would also allow Peters to speak to DeLaughter *ex parte* without Wilson's knowledge; Langston testified that the Scruggs team's opportunity to gain *ex parte* access through Peters was "clearly thought out"[88] and that it "was our expectation" to influence the judge in the Petitioner's favor.[89]

However, at the evidentiary hearing, Langston equivocated. He testified that he asked Peters not to enter an appearance at first because Peters' role was not yet known.[90] He also testified—in conflict with his earlier testimony that the *ex parte* contact was intended, or "clearly thought out"—that it later "became apparent that [Peters] was having *ex parte* communications and talking directly to Bobby DeLaughter" and that the Scruggs team simply "acquiesced" to the *ex parte* communications.[91]

---

[84] Langston Grand Jury Test. [135-1] at 16; Evidentiary Hr'g at 102.
[85] Langston Grand Jury Test. [135-1] at 16; Evidentiary Hr'g at 102.
[86] Langston Grand Jury Test. [135-1] at 14.
[87] *Id.* at 50–51; Peters 302, 12/18/07, at 6; Patterson Dep. [135-5] at 21–22.
[88] Langston Grand Jury Test. [135-1] at 50–51; Patterson Dep. [135-5] at 35–36 ("Clearly we all knew he could have those conversations.").
[89] Langston Grand Jury Test. [135-1] at 15.
[90] Evidentiary Hr'g at 68–69.
[91] *Id.* at 68–69, 101–02.

Peters agreed to work on the Petitioner's behalf, but repeatedly stated that he believed DeLaughter would do his own research and follow the law.[92] Peters said, "I cannot get him not to follow the law."[93] Langston explained to Peters what the *Wilson* case was about, what issues were pending, and the legal team's position on those issues.[94] Peters told the FBI he "was not involved in the decision making or knowledge of the facts of the case," and that "it was clear to him that he was not being hired by Joey Langston to work on the case, but instead to influence DeLaughter. Nobody told him that he would be doing trial work. Peters knew that the Petitioner's defense team was interested in his relationship with DeLaughter."[95]

Peters believes that at the end of the second meeting after he had been given $50,000 in cash, Langston or Patterson said to Peters: "[Y]ou mentioned that Bobby was interested in the federal judgeship or that he was up for a magistrate position. . . . This doesn't have anything to do with the case that's going on; however, we want you to know that Dickie Scruggs is the brother-in-law of Trent Lott, and he will put in a good word for Bobby. Again, it doesn't have anything to do with the case."[96] When DeLaughter was interviewed by the FBI, he also stated that the Petitioner's offer to help him obtain a federal judgeship was communicated to him soon after Peters began working on the Petitioner's behalf.[97] DeLaughter's 302 states that during Peters' second call to him regarding *Wilson*, Peters relayed a message from Langston: "We can

---

[92] Peters 302, 12/19/07, at 3; Langston Grand Jury Test. [135-1] at 15, 46–47; Patterson Dep. [135-5] at 36–37; Evidentiary Hr'g at 117.

[93] Langston Grand Jury Test. [135-1] at 15; Evidentiary Hr'g at 70.

[94] Langston Grand Jury Test. [135-1] at 14.

[95] Peters 302, 9/9/2008.

[96] Peters Grand Jury Test. [135-2] at 14–17; Peters 302, 9/9/08, at 3; Peters 302, 12/18/07, at 4 ("Langston told Peters, 'This does not have anything to do with the case, but Dickie [Scruggs] will talk to Trent [Lott] to get [DeLaughter] a judgeship. . . .' Again they stated that the judgeship appointment would not be related to the ongoing case.").

[97] DeLaughter 302, 12/10/2007; Pet'r's Ex. 40 at 3.

help this," referring to helping DeLaughter obtain a federal magistrate position.[98]  DeLaughter told the FBI that the second call from Peters occurred "[i]n January 2006, before [DeLaughter] ruled upon a motion that involved fiduciary duty," and that Peters "told him that Langston could help him get the United States Magistrate position that was open in the United States Federal Court, Southern District of Mississippi."[99]  Consistent with Peters' testimony and DeLaughter's statement to the FBI, Balducci also testified that discussions about helping DeLaughter obtain a federal judgeship occurred "early in our involvement" and throughout the case.[100]  Langston testified at the evidentiary hearing that the issue regarding DeLaughter's interest in a federal judgeship "pop[ped] up" "if not in the middle of it, close to the middle of [the *Wilson* litigation]," but, again, Langston's testimony contradicts his own plea to a bribery scheme beginning in January 2006.[101]

Langston testified before the grand jury that he learned of DeLaughter's ambition to be a federal judge through Peters, and Peters "let us know . . . that DeLaughter was interested in open federal judgeships that came open during the time that this litigation was pending."[102]  Langston stated that he told the Petitioner about DeLaughter's interest in a federal judgeship, and "[the Petitioner] told me unequivocally that he would support Bobby DeLaughter's interest in those judgeships and that he would approach [then-Senator] Trent Lott about getting DeLaughter on the list of judges for consideration."[103]  At his plea colloquy, Langston agreed under oath that the Petitioner told him "to let the Judge know that if he ruled in his favor he would pass his name along for consideration regarding the federal judgeship."

---

[98] DeLaughter 302, 12/10/2007; Pet'r's Ex. 40 at 3.
[99] DeLaughter 302, 12/21/2007.
[100] Balducci Dep. [135-4] at 79–80.
[101] Evidentiary Hr'g, [3] in 1:08-CR-00003, at 85–86.
[102] Langston Grand Jury Test. [135-1] at 25.
[103] *Id.* at 26, 27.

Peters was glad to hear that the Petitioner would approach then-Senator Lott regarding DeLaughter's interest in a federal judgeship.[104] "Peters thought that if DeLaughter could 'help' Scruggs, then Scruggs could 'help' DeLaughter. Peters stated that DeLaughter's 'help' to Scruggs would consist of favorable treatment."[105] Balducci testified that, in return for allowing himself to be influenced, DeLaughter would receive consideration for a federal judgeship; Balducci testified that he knew that to be the case because he "[h]ad very specific conversations with Scruggs, Langston, Patterson[,] and Peters about it."[106] Balducci explained at the evidentiary hearing that he did not speak directly to the Petitioner about this matter, but he was present when the matter was discussed between the Petitioner, Langston, and Patterson.[107]

Peters told DeLaughter about Langston's statement regarding the Petitioner offering to approach then-Senator Lott on DeLaughter's behalf.[108] "DeLaughter stated that it was good, but that it would not decide the case."[109] DeLaughter told the FBI that "he instructed Peters to 'make damn sure to them that there would be no *quid pro quo*.' He advised he would not show favoritism."[110]

Regarding the Petitioner's promise to approach then-Senator Lott about DeLaughter's interest in a federal judgeship, Langston testified to the grand jury:

> Q. Now, did Mr. Scruggs know that that information had been passed back down to DeLaughter through Mr. Peters about having Trent Lott make the phone call?
>
> A. Yes. He and I had those discussions. We talked on a number of occasions about DeLaughter's interest in the judgeships,

---

[104] Peters 302, 9/9/08, at 3.
[105] *Id.* at 4.
[106] Balducci Dep. [135-4] at 79; Evidentiary Hr'g at 144.
[107] Evidentiary Hr'g at 144.
[108] Peters 302, 12/18/07, at 4.
[109] Peters 302, 9/9/08, at 4.
[110] DeLaughter 302, 12/10/2007, at 3.

the fact that it would be important for DeLaughter's—it's not a candidacy, but for DeLaughter to have—it was critical to have the support of a United States Senator, Trent Lott. And he wanted us to help him get that support.

I didn't have the influence with him but of course Dick did. And he said many, many times that he didn't always have the influence that people thought he did with Trent Lott. But the important thing here was that we needed Bobby DeLaughter to know that we were supporting him and that we had done our part in contacting Trent Lott in support of his candidacy.

Q.    And did you think and did Dick Scruggs think based on your conversations that this substantially helped Dick Scruggs' cause in the case before Bobby DeLaughter.

A.    Absolutely. We thought that if he knew Dick Scruggs was willing to support his interest in getting that judgeship that it would help us in the rulings that he issued in the *Wilson versus Scruggs* case.[111]

Once Peters was paid $50,000 to assist the Petitioner in the *Wilson* case, Peters' communications with DeLaughter about the *Wilson* case increased.[112]  Langston and Balducci did not enter their appearances in *Wilson* as attorneys for the Petitioner until January of 2006.[113] Peters was contacted and retained at about this same time.[114]  Langston admitted during his plea colloquy that he engaged in a bribery scheme "[f]rom on or about January 2006 and continuing until on or about March 2007."[115]

In January of 2006, Balducci—at Langston's direction—assembled a small package of documents to send to Peters.[116]  Langston included in the package to Peters a memo explaining

---

[111] Langston Grand Jury Test. [135-1] at 28–29.
[112] Peters 302, 12/18/07, at 3.
[113] Langston Plea Colloquy, [47] in 1:08-CR-00003, at 16.
[114] *Id.*
[115] Langston Factual Basis, Information, [3] in 1:08-CR-00003.
[116] Balducci Dep. [135-4] at 103.

to Peters that the Petitioner's team "badly needed a continuance of trial."[117] Trial in the *Wilson* case was set for late January 23, 2006.[118] On January 3, 2006, the Petitioner's lawyers filed a motion for continuance.[119] On January 12, 2006, DeLaughter held a hearing on the motion for continuance.[120] The Petitioner's lawyer, John Jones, argued for a continuance, while Wilson's lawyer, Bill Kirksey, argued against a continuance.[121] Balducci testified in a 2009 deposition that DeLaughter told the lawyers that he would create a scheduling order without the parties' input, because the parties were contentious and could not agree on anything.[122] The transcript of the 2006 hearing regarding the status conference substantiates Balducci's testimony exactly.[123]

Balducci testified that within days of the hearing on the motion for continuance, Langston came to him and asked him to prepare a memo on matters the Petitioner's team would want included in a scheduling order, as well as prospective dates.[124] After Balducci prepared the memo, Langston asked him to put the memo in the format of an actual scheduling order.[125] Balducci did so. Within about a week, DeLaughter entered a scheduling order that mimicked the substance of Balducci's proposed scheduling order.[126] Balducci was not at this time directly involved in meeting with Peters regarding the *Wilson* case, but this event led Balducci to believe that Peters was directly influencing DeLaughter.[127] Balducci asked Patterson about the matter,

---

[117] *Id.* at 103–04.
[118] Pet'r's Ex. 4 at 16.
[119] *Id.* at 7.
[120] Balducci Dep. [135-4] at 27; Pet'r's Ex. 4 at 4.
[121] Pet'r's Ex. 4 at 32.
[122] Balducci Dep. [135-4] at 28; Evidentiary Hr'g at 134–35.
[123] Pet'r's Ex. 4 at 36, 40.
[124] Balducci Dep. [135-4] at 28–29; Evidentiary Hr'g at 135.
[125] Balducci Dep. [135-4] at 29; Evidentiary Hr'g at 135.
[126] Balducci Dep. [135-4] at 30–32; Evidentiary Hr'g at 135–36.
[127] Balducci Dep. [135-4] at 30–31; Evidentiary Hr'g at 136.

and Patterson confirmed that "Peters had been retained as a conduit of information between us and Judge DeLaughter to influence him in our favor."[128]

Balducci became fully cognizant and involved in the scheme involving Peters as the *Wilson* litigation progressed.[129] Langston and Balducci began sending Peters drafts of the Petitioner's motions and briefs that they anticipated filing in the *Wilson* case.[130] They wanted to know what Peters thought DeLaughter would do in regard to their motions and briefs.[131] Peters provided copies of these pre-filed motions and briefs to DeLaughter.[132] DeLaughter told Peters what his ruling was going to be,[133] and DeLaughter's anticipated rulings were relayed to Langston or Balducci.[134] Peters gave Langston's team the benefit of DeLaughter's thinking—the cases and reasoning that were important to DeLaughter and the arguments with which DeLaughter disagreed.[135] If DeLaughter's ruling would be adverse to the Petitioner, DeLaughter would tell Peters that the Petitioner's legal team needed the legal authority to show why DeLaughter should not rule against them.[136] DeLaughter would give Peters case citations to give to Balducci.[137] One citation was to a case that DeLaughter believed did not allow him to dismiss Wilson's case.[138] DeLaughter relayed the message to Balducci that if he disagreed, to tell him why he was wrong.[139] Peters made handwritten edits on the Petitioner's two pre-filed motions for partial summary judgment reflecting his discussions with DeLaughter and DeLaughter's

---

[128] Balducci Dep. [135-4] at 32–33; Evidentiary Hr'g at 136.
[129] Balducci Dep. [135-4] at 36–39; Langston Grand Jury Test. [135-1] at 31.
[130] Peters 302, 12/18/07, at 3; Peters 302, 9/9/08, at 4.
[131] Peters 302, 12/18/07, at 3.
[132] Peters 302, 9/9/08, at 4; Peters 302, 1/23/2008, at 2; DeLaughter 302, 12/21/2007, at 3.
[133] Peters 302, 9/9/08, at 4.
[134] Balducci Dep. [135-4] at 127–28.
[135] Langston Grand Jury Test. [135-1] at 21; Evidentiary Hr'g at 136–37; Balducci Dep. [135-4] at 36.
[136] Peters 302, 9/9/08, at 4; Langston Grand Jury Test. [135-1] at 20–21.
[137] Peters 302, 1/23/08, at 2; Patterson Dep. [135-5] at 50–51.
[138] Peters 302, 1/23/08, at 2.
[139] *Id.*

questions and suggestions for fleshing out the issues or supporting them with more facts.[140] DeLaughter sent a draft of his opinion to Peters in regard to the Petitioner's motion for partial summary judgment.[141] Langton's team asked Peters to try to convince DeLaughter that their positions were correct.[142] Peters would report back about how the Langston team's arguments faired with DeLaughter.[143] Knowing DeLaughter's thinking allowed Langston's team to shape their arguments and motions accordingly and "focus their efforts."[144] Langston testified before the grand jury: "[W]e certainly took advantage of the information we had in shaping our arguments so that they would favor Mr. Scruggs."[145] The Petitioner, Langston, and Balducci discussed the fact that Balducci, in arguing motions before DeLaughter, had the benefit of knowing DeLaughter's thinking on the motions before having to argue them before DeLaughter.[146] Langston testified that the object was to get DeLaughter "to rule based on what we considered the law to be."[147] Langston testified at the evidentiary hearing: "[W]e had enough goodwill with the Court that we would prevail in discretionary calls, or that we wouldn't be punished with discretionary calls, as well, which is something that we—you know, right or wrong—were concerned about."[148] Langston stated at the evidentiary hearing that "he could not pick out an order that [DeLaughter] issued that was shaded in our favor."[149] But, far from this overly simplistic view of what transpired, Balducci testified at the evidentiary hearing: "We

---

[140] Balducci Dep. [135-4] at 73–74, 124–26.
[141] DeLaughter 302, 12/21/2007, at 3.
[142] Langston Grand Jury Test. [135-1] at 21; Evidentiary Hr'g at 73–74, 102.
[143] Langston Grand Jury Test. [135-1] at 21; Balducci Dep. [135-4] at 39.
[144] Langston Grand Jury Test. [135-1] at 21–22; Evidentiary Hr'g at 103, 105.
[145] Langston Grand Jury Test. [135-1] at 22.
[146] *Id.* at 31–32.
[147] Evidentiary Hr'g at 105.
[148] *Id.* at 107.
[149] *Id.* at 125.

worked very hard to try to produce legitimate legal arguments that [DeLaughter] could hang his hat on to rule in our favor."[150]

Peters testified before the grand jury:

> Q.      Did Judge DeLaughter ever send word back to the Scruggs legal team through you?  For example, did he ever send word through you that if they wanted him to rule in their favor on a particular motion he would need more on this point or that point in order to do so?
>
> A.      On occasion that I recall he said they had—the issue was brief, looked at the brief.  He I think did some research on his own, and then he said what they have is not correct—is not sufficient.  If they want me to rule in their favor they're going to need to find something else.  They gave me the same authority again, and he said I'm going to have to rule against them.  And he did.
>
> Q.      Did this happen in open Court or was this behind the scenes?
>
> A.      Behind the scenes.
>
> . . .
>
> Q.      Did Judge DeLaughter ever send you by way of your wife's e-mail account an advance copy of an Order that he planned on entering?
>
> A.      That's correct, he did.
>
> Q.      And what did you do with it?  Who did you take it to?
>
> A.      To Patterson and/or Langston and/or Balducci.
>
> Q.      Okay.  Did Judge DeLaughter ever say to you we can't be having these conversations?
>
> A.      No.[151]

---

[150] *Id.* at 142–43.
[151] Peters Grand Jury Test. [135-2] at 12–13.

Whenever Peters would report to Langston regarding DeLaughter's positions on the issues, Langston would relay this information to the Petitioner.[152]  The Petitioner, Langston, Patterson, and Balducci were privy to Peters' role in influencing DeLaughter,[153] but the Petitioner's other lawyers were not aware of Peters' influence.[154]  Of course, the Wilson side of the case was unaware, because Peters had never entered an appearance in the case.[155]

Peters personally visited DeLaughter at least five times, and possibly more than eight times, in regard to the *Wilson* litigation.[156]  Peters would contact Langston or Patterson after Peters met with DeLaughter.[157]  Langston and Balducci would schedule trips to see Peters around Peters' meetings with DeLaughter.[158]  Balducci met with Peters in Jackson at least six times.[159]  Langston attended about twelve or fifteen meetings with Peters.[160]  Balducci sometimes met with Peters when Langston was not present.[161]

In March of 2006, DeLaughter was advised that although he had not gotten the magistrate judge position,[162] a U.S. District Court judge position had become available in the Southern District of Mississippi.[163]  "On March 6, 2006, Chip Reynolds, an employee of United States Senator Trent Lott[,] came to DeLaughter's office" and told DeLaughter "that he needed to send a letter and a resume to both Mississippi United States Senators."[164]  In late March of 2006,

---

[152] Evidentiary Hr'g at 102.
[153] Balducci Dep. [135-4] at 93.
[154] *Id.* at 93, 102; Evidentiary Hr'g at 33.
[155] Langston Grand Jury Test. [135-1] at 19–20.
[156] Peters 302, 12/18/07, at 4.
[157] *Id.*
[158] Balducci Dep. [135-4] at 55.
[159] *Id.* at 70.
[160] Langston Grand Jury Test. [135-1] at 20; Evidentiary Hr'g at 105.
[161] Langston Grand Jury Test. [135-1] at 20.
[162] DeLaughter 302, 12/21/2007, at 3.
[163] *Id.*
[164] *Id.* at 4.

DeLaughter received a call from Peters. Peters told him that Langston had said to expect a telephone call from Senator Lott. Peters called several people on behalf of DeLaughter to notify them of DeLaughter's interest in becoming a United States District Judge. Steve Patterson had told Peters that DeLaughter needed to telephone both Mississippi United States Senators to let them know that he was interested. DeLaughter did talk to Senator Thad Cochran. He also tried to call Senator Lott.[165]

Patterson told Peters "that he already had talked to United States Senator Joseph Biden of Delaware about DeLaughter."[166]

According to Balducci and Peters,[167] in late March of 2006, after DeLaughter was passed over for a federal judgeship, Balducci and Patterson met with Peters.[168] Peters told them DeLaughter was very upset about being passed over. Peters also told them that DeLaughter wanted some assurances, because he had exposed himself by helping Scruggs in the *Wilson* case and was beginning to wonder if Scruggs "was essentially going to renege on him and not uphold his part of the deal."[169] Peters informed the FBI that he had told DeLaughter that Scruggs was not doing enough to help DeLaughter obtain a federal judge position.[170] Whenever Peters asked Patterson about current vacant federal judge positions, Patterson would tell Peters that DeLaughter would get the next one.[171] Patterson once told Peters that the "Turk" was going to get the current judgeship.[172] And Patterson once told Peters that the current judgeship was going

---

[165] *Id.*

[166] Peters 302, 12/18/07, at 5.

[167] In the evidentiary hearing, Patterson testified that this meeting did not take place. Evidentiary Hr'g at 122.

[168] Balducci Dep. [135-4] at 81, 84; Evidentiary Hr'g at 145; Peters 302, 9/9/08, at 4.

[169] Balducci Dep. [135-4] at 81–82.

[170] Peters 302, 9/9/08, at 4.

[171] *Id.*

[172] *Id.*

to be determined by Mississippi United States Senator Thad Cochran.[173]  Peters always passed

this information from Patterson to DeLaughter.[174]

Then-Senator Lott called DeLaughter on March 29, 2006.  DeLaughter told the FBI that

Senator Lott told him, "My no[-]good brother[-]in[-]law Dickie, is here and said that you are a

fine judge,"[175] and that Senator Lott then "asked [DeLaughter] if he was interested in being a

United States District Court Judge."[176]  DeLaughter told Senator Lott that he was interested, and

Senator Lott told DeLaughter he could make no promises.[177]

Peters told the grand jury that DeLaughter called him and said, "[Y]ou're not going to

believe this or guess what or something like that.  I just received a call from Trent Lott. . . . He

told me that his quote, sorry[-]ass brother-in-law, end quote[,] had just called him—or not just

called him— . . . and let him know that he was interested in the . . . federal judgeship.  And . . . it

was [Senator Lott's] practice before he placed anybody's name on the list for a judgeship that he

called the person and made sure they were interested in it," and  "[DeLaughter] told him that he

was."[178]

When Former-Senator Lott was asked at the evidentiary hearing "is it true that you said

to Judge DeLaughter that your sorry brother-in-law had told you he was a good judge," Lott

stated: "I didn't remember that, but I think it probably could have been."[179]  Lott also testified

---

[173] *Id.*
[174] *Id.*
[175] DeLaughter 302, 12/21/2007, at 4.
[176] *Id.*
[177] *Id.*
[178] Peters Grand Jury Test. [135-2] at 24.
[179] Evidentiary Hr'g at 69.

that at least one other attorney besides Scruggs had recommended DeLaughter for a federal judgeship.[180]

Former-Senator Lott acknowledges that around March 29, 2006, Scruggs called him about DeLaughter's interest in the process of being selected for a federal judgeship.[181] Lott denies that Scruggs asked Lott for his influence in helping DeLaughter obtain a federal judgeship.[182] Lott testified that Scruggs "just said that Judge DeLaughter was interested in discussing the process of how people are selected to be federal judges and would I be willing to call and discuss it with him."[183] Lott told the Petitioner that he would call DeLaughter,[184] and "we instigated the call right then."[185] Lott stated that he generally extended the courtesy of calling and talking to persons that others recommended for judgeships.[186] Lott testified that he did not know that the Petitioner had a case pending before DeLaughter at the time that Lott called DeLaughter.[187] Lott stated that he knew of Jones' and Wilson's suits against Scruggs generally, but that he did not know where they were being tried.[188]

Former-Senator Lott testified that his call with DeLaughter was brief; Lott said he explained to DeLaughter that he and Senator Cochran selected nominees to be sent to the

---

[180] It is interesting to note that although Lott testified that at least one other attorney had recommended DeLaughter for a federal judgeship, in the phone call to DeLaughter, Lott told DeLaughter only that his brother-in-law, and not any other attorney, had recommended DeLaughter for a federal judgeship.

[181] Lott Dep. [135-3] at 12–14, 25; Evidentiary Hr'g at 51, 53.

[182] Lott Dep. [135-3] at 14.

[183] Evidentiary Hr'g at 53–54.

[184] L Lott Dep. [135-3] at 14; Evidentiary Hr'g at 53.

[185] Evidentiary Hr'g at 53.

[186] Lott Dep. [135-3] at 15–16.

[187] *Id.* at 15.

[188] *Id.* at 27.

President for federal judgeships by consensus,[189] and communicated the criteria the Senators were looking for in terms of age and experience.[190]

In Former-Senator Lott's October 2008 deposition, he testified that he was "pretty sure" that he emphasized to DeLaughter that he wanted somebody from the Coast for a vacancy in the Southern District of Mississippi.[191] At the evidentiary hearing, Lott testified that he definitively remembered telling DeLaughter that Judge Bramlette's vacancy was going to be filled by someone from the Coast:

> I specifically talked about geography. I don't remember if I told him specifically that we . . . already had a person in the mill. I probably said, yes, we have somebody that we've already recommended to the President. And then I do remember talking about how I felt like that the other vacancies, Judge Bramlette's vacancy really was one that needed to go to the Coast. And I think that was about the gist of it. And I said, you know, if you'd like to send your letter, your resume, we'd be glad to . . . keep it in our file for future reference.[192]

On cross-examination, Lott reverted to his original testimony and stated, "I think I probably did make it clear that I was going to be looking for somebody on the [C]oast to take Judge Bramlette's place, because I felt so strongly about that."[193] Lott's employee, Hugh Gamble, who was in the room when Lott called DeLaughter, testified that Lott's call with DeLaughter lasted about five minutes and was a "conversation . . . about the process by which those selections are made, the criteria that are used, and how that process moves forward."[194] Gamble testified that Lott did mention geography and that Judge Bramlette's vacancy was "a

---

[189] *Id.* at 17. At the evidentiary hearing, Lott testified, "[A]lmost without exception we'd come to a consensus agreement." *See* Evidentiary Hr'g at 37.

[190] Lott Dep. [135-3] at 17.

[191] *Id.* at 17–18.

[192] Evidentiary Hr'g at 55.

[193] *Id.* at 71.

[194] *Id.* at 80–81.

Coast seat."[195]  Lott also stated that it would have been "common knowledge that Jordan had gotten the nomination long before April 21, 2006."[196]

Former-Senator Lott testified that he did not convey to DeLaughter that he would be given more consideration than anyone else would receive.[197]  Lott testified that he had no intention of actually considering DeLaughter, because Lott "did not know [DeLaughter]," and DeLaughter was too advanced in age, not from the Mississippi Gulf Coast, and "had been involved in some controversial matters."[198]  At the evidentiary hearing, Lott stated, "It was a courtesy call.  I treated it that way.  But he did not fit the bill of what I was looking for.  So why would I have in any way encouraged him?"[199]  Lott acknowledged, however, that he did not have any knowledge of what may have been communicated to DeLaughter by the Petitioner, Langston, Peters, and Balducci.[200]

Lott received a letter from DeLaughter dated March 30, 2006 which stated:

> Re: United States District Court
> Southern District of Mississippi

> Dear Senator Lott:

> Thank you so much for the telephone call yesterday inquiring about my interest in any appointment to the federal district court that may become available.  As I said during our conversation, I am very interested in such a position and honored by your consideration.

> A copy of my resume has been e-mailed to Bret Boyles of your office and I understand that he forwarded it to Hugh Gamble, your legislative counsel.  I look forward to any opportunity to speak with you further and, of course, if in the meantime there is any

---

[195] Id. at 81.
[196] Lott Dep. [135-3] at 36, 40, 42.
[197] Id. at 18.
[198] Id. at 22; Evidentiary Hr'g at 55.
[199] Evidentiary Hr'g at 74.
[200] Lott Dep. [135-3] at 21, 32–33; Evidentiary Hr'g at 63.

other information that I may provide or steps that I need to take, please let me know.

Respectfully yours,
Bobby B. DeLaughter[201]

At the evidentiary hearing, Patterson contradicted his testimony from a 2009 deposition.

In 2009, Patterson had testified that his reaction to Lott's call to DeLaughter was as follows:

> A.      . . . . The phone rings, and it was Mr. Langston.  And he tells me that he has been told, I guess, by Scruggs, that the Senator had called Bobby DeLaughter and asked him about the judgeship, about presenting his name as a judgeship.
>
> I shall never forget that call, because I thought it was the most insane thing I had ever heard in my entire life, that—that a United States Senator whose brother-in-law was in—in a case of this magnitude would actually call the Judge and ask him—I thought that was just going way over the line.  I thought that was unnecessary, thought it was politically stupid, thought it made no sense, . . .
>
> Q.      What—I'm sorry.
>
> A.      Now, we all knew that Judge DeLaughter, as do all of you guys, have ambitions to be federal judges one day.
>
> Q.      Not me.
>
> A.      And that was no secret to anyone as well, but for the Senator to have made that call . . . I thought it was a bit gutsy.
>
> Q.      When you say you thought it was "a bit gutsy," what do you mean by that?
>
> A.      I thought it was unnecessary.  I think that everyone, I think, at the time thought that Judge DeLaughter had the integrity, and had the judicial temperament, had the education, had the background that would make a great federal judge.
>
> But the fact that he was sitting on this case with his brother-in-law with—with Dickie, the Senator's brother-in-law at the time,

---

[201] Pet'r's Ex. 18; Lott Dep. [135-3] at 12.

presiding over it, I thought it was just a little over the line for that call to be made in that way.

Q.    You thought it was risky?

A.    I thought it was risky, and I thought that Ed had probably communicated it without the necessity of that being done.

Q.    What do you mean, "Ed had communicated it without the necessity of that being done["?]

A.    Well, I mean, you know, it doesn't take much to figure out, hey, this guy is the Senator's brother-in-law, and it's United States Senators that make the call on who's going to be a federal judge.

And clearly one with the kind of clout that's the former majority leader, and I guess was the currently the minority leader at the time. I'm not certain of that, but I mean, that was just—that was just, you know, using a—using a cannon to kill a gnat in my opinion.

Q.    Now, when you said, "I thought Ed had probably communicated it without the necessity of that being done," the "it" being that Scruggs—

A.    The "it" being—

. . .

"It" being the political strategy of, that, hey, this is—this is Trent Lott's brother-in-law, this is a sensitive thing. You ought to either recuse yourself from the case, or you've got to be real careful in the—in the event that you do want to—in the event that you do want to solicit Trent's support, you know, you can't make bad rulings that negatively impact his brother-in-law.

That's—that's the "it" that I'm talking about. Be cautious here, this is—this is the Senator's brother-in-law you're dealing with. You want to be a federal judge. Be careful.[202]

At the Petitioner's evidentiary hearing, roughly three years later, Patterson's testimony

regarding why Lott's call was "insane" changed. "We were getting what we needed," Patterson

---

[202] Patterson Dep. [135-5] at 55–58.

said. "Why buy the cow when you were getting the milk?"[203] The Petitioner's lawyer asked, "He's already getting all the benefit prior to any mention of a judgeship, correct?" and Patterson agreed.[204] The Petitioner's lawyer asked Patterson a second time: "Just so we're clear, this *ex parte* or secret access, however you want to distribute it, it was occurring well before any mention of a federal judgeship, correct?"[205] Patterson responded, equivocating in his statement: "As I now understand it, yes, that's correct."[206] Patterson's statement that the *ex parte* access occurred well before the mention of a federal judgeship contradicts the testimony of Peters, DeLaughter, and Balducci, as well as Patterson's 2009 testimony. The Court finds this portion of Patterson's testimony at the evidentiary hearing not to be credible.

The Petitioner told Langston that he was going to contact Lott about DeLaughter. Then, after the Petitioner contacted Lott, the Petitioner confirmed to Langston that he had contacted Lott.[207] The Petitioner told Balducci and Langston that Lott had called DeLaughter to let him know that "everything's going to be okay."[208] Peters also told Balducci and Langston that "Lott had called him and told him everything's going to be okay."[209] Balducci testified that Lott's call "smoothed things over for a while" and "exhibited the good faith, if you will, of the arrangement."[210]

The Petitioner and Langston agreed to a reverse contingency arrangement.[211] Langston asked the Petitioner what he would pay to fully and finally resolve the *Wilson* case; the Petitioner

---

[203] Evidentiary Hr'g at 119.
[204] *Id.*
[205] *Id.* at 120.
[206] *Id.* (emphasis added).
[207] Langston Grand Jury Test. [135-1] at 27.
[208] Balducci Dep. [135-4] at 84.
[209] *Id.*
[210] *Id.*
[211] Langston Grand Jury Test. [135-1] at 17; Patterson Dep. [135-5] at 64.

said three million dollars.[212] The Petitioner agreed that if Langston won the case outright, Langston's team would be paid three million dollars.[213] If the Petitioner ended up paying any part of three million dollars, the part paid would be deducted from what the Petitioner paid to Langston's team.[214] Langston communicated the arrangement to Peters and told him that he could make as much as one million dollars under the arrangement.[215] Patterson testified that the reverse contingency fee was offered by the Petitioner to incentivize his team to make sure that the numbers paid to Wilson came in as low as possible.[216] Peters told the FBI that the reverse contingency arrangement was used "to motivate [him] even more to insure that DeLaughter would rule in their favor."[217] Langston testified that the reverse contingency arrangement was not an incentive.[218]

In June of 2006,[219] DeLaughter *sua sponte* set a settlement conference in the *Wilson* case.[220] The parties were required to submit confidential settlement memoranda to DeLaughter.[221] DeLaughter communicated Wilson's positions in their settlement documents to Peters, who in turn communicated those positions to Langston.[222] The Petitioner had the benefit of knowing Wilson's positions on settlement.[223]

---

[212] Langston Grand Jury Test. [135-1] at 17.
[213] *Id.*
[214] *Id.* at 18–19.
[215] Patterson Dep. [135-5] at 62–64, 66–68.
[216] Evidentiary Hr'g at 129.
[217] Peters 302, 12/18/07, at 5.
[218] Evidentiary Hr'g at 77.
[219] *Id.* at 42.
[220] Balducci Dep. [135-4] at 52.
[221] *Id.* at 54.
[222] Balducci Dep. [135-4] at 54, 118, 120.
[223] *Id.* at 54.

On June 12, 2006, the Wilson side of the case filed three motions for quantification[224] asking DeLaughter to determine the dollar amount to which Wilson was entitled.[225] The Petitioner's legal team thought that the motions for quantification were inappropriate and invaded the province of the jury to determine the damages owed to Wilson.[226] The legal team also thought it might be an opportunity to have DeLaughter quantify in the Petitioner's favor and determine that the Petitioner owed Wilson no further damages.[227]

Regarding the motions for quantification, Balducci testified:

> [T]here were a series of discussions had about if we go down the road, if we respond in a substantive fashion to these motions, then we have to know what the outcome is going to be. . . . Joey [Langston], Steve [Patterson], Scruggs, [Balducci], and Peters were all involved directly in communications about those issues. And Peters responded to our inquiries by saying to us, "File—file the responses. Go forward. You're going to be fine. Go forward. You're going to be successful." So based on his representations that we would be successful on those claims, we decided to respond on the merits rather than raising these procedural objections to the motions. We decided to waive those, not bring them up, to respond on the merits to the motions for quantification. And we did, filed our responses saying, essentially, that our experts say this is what is owed to Wilson, and, in fact, this is what we've paid. We've paid him everything's he's due.[228]

Before DeLaughter entered his order on the quantification issue on July 7, 2006, Peters faxed to Langston a copy of the last page of the order where DeLaughter had tallied up the amounts owed to Wilson and concluded that Scruggs owed Wilson nothing more than what

---

[224] Exs. 22, 23, 24; Evidentiary Hr'g at 27. Patterson testified in his deposition that the reverse contingency arrangement occurred after the motions for quantification were filed but before DeLaughter ruled on them. Patterson Dep. [135-5] at 70.

[225] Balducci Dep. [135-4] at 43.

[226] *Id.* at 44; Evidentiary Hr'g at 39, 116–17, 139.

[227] Balducci Dep. [135-4] at 45; Evidentiary Hr'g at 30, 139.

[228] Balducci Dep. [135-4] at 46; Evidentiary Hr'g at 139–40, 156 ("My recollection is that Peters told us to not object on procedural grounds to the quantification order, go ahead and file a responsive pleading on the merits and that everything would be okay; it would come out in our favor.").

Scruggs had already paid him, which was $6.9 million.[229]  The order was not dated, and the

judge's signature line was blank.[230]  Because DeLaughter found that Scruggs owed Wilson no

compensatory damages, Wilson could not receive punitive damages.[231]  Langston, Balducci, and

Patterson immediately called Scruggs and told him about the faxed order from Peters, and also

told him that DeLaughter was going to find that Scruggs owed no additional money to Wilson.[232]

The Petitioner responded, "That's great," and instructed the trio to "make sure [you] keep [your]

skirts clean."[233]  When DeLaughter ultimately entered the quantification order on July 7, 2006,

the entered order was the same as the one faxed to Langston—except that the entered order was

signed and dated.[234]  Langston testified before the grand jury that DeLaughter's finding in the

order on quantification caused settlement to occur, because "we thought we had them blocked on

receiving any monetary damages."[235]

Both Balducci and Langston testified that DeLaughter's finding that Scruggs owed no

further amount to Wilson posed a problem; they were concerned that there was insufficient

expert testimony in the record to support DeLaughter's finding upon appeal.[236]  Wilson's

attorneys filed a motion for DeLaughter to reconsider the order on quantification, and

DeLaughter denied the motion without any discussion.[237]  Balducci testified that but for Scruggs'

exposure on that issue, "the case wouldn't necessarily have had to have been settled."[238]

Another member of Scruggs' legal team, who was unaware of the ongoing *ex parte*

---

[229] Balducci Dep. [135-4] at 47, 112–14; Langston Grand Jury Test. [135-1] at 30; Evidentiary Hr'g at 116, 140–41.

[230] Balducci Dep. [135-4] at 47, 112–13; Evidentiary Hr'g at 140–41.

[231] DeLaughter 302, 12/21/07, at 5; Langston Grand Jury Test. [135-1] at 38.

[232] Balducci Dep. [135-4] at 47, 116.

[233] *Id.* at 117, 141.

[234] *Id.* at 47.

[235] Langston Grand Jury Test. [135-1] at 38.

[236] Evidentiary Hr'g at 117, 158–59; Balducci Dep. [135-4] at 48–52.

[237] Balducci Dep. [135-4] at 48–52; Evidentiary Hr'g at 143–44.

[238] Balducci Dep. [135-4] at 52.

communications with the court, testified that he had no concern regarding the order and that there were no errors involving Scruggs' response to Wilson's motions for quantification.

DeLaughter issued other orders on July 7, 2006, along with the order on quantification.[239] Even before the orders were entered, Langston and Balducci already knew what the orders would provide, based on Peters' communications with DeLaughter.[240] Langston and Balducci also knew the outcome of at least some of their motions before they filed them, and they certainly knew the outcome of all of their motions before DeLaughter issued his orders.[241] They knew that DeLaughter was committed to awarding Wilson a *de minimis* actual award, and if the case went forward to a punitive damages phase, it was going to be very limited.[242] The information that Peters relayed to Langston and Balducci "bore out" on every occasion, and DeLaughter's rulings reflected the information provided to Langston and Balducci by Peters.[243]

The parties were summonsed to trial on August 21, 2006, but the case settled before *voir dire* was concluded. The Petitioner paid "something over two million dollars" to settle a related federal case being dismissed for zero additional dollars.[244] Peters met with Langston the night before trial was to commence.[245] When Langston returned from the meeting, he told Balducci and Patterson what was going to occur at the trial and what arguments they should make.[246] Balducci was preparing to argue the remaining narrow issue before DeLaughter, when Langston bluntly stated that "it didn't matter which way it went, we were going to be okay . . . . —that the Court was going to exclude [Wilson's] proof, was going to strike their report and that we were to

---

[239] *Id.* Exs. 5004, 5005, 5006, 5007, 5008.
[240] *Id.* at 87.
[241] *Id.*
[242] *Id.* at 75.
[243] *Id.*
[244] Langston Grand Jury Test. [135-1] at 38–39; Balducci Dep. [135-4] at 57.
[245] Balducci Dep. [135-4] at 59; DeLaughter 302 ,12/10/2007, at 2–3.
[246] Balducci Dep. [135-4] at 59, 121.

45

go forward with a trial for bragging rights."[247] Langston used the term "bragging rights" at the meeting the night before the trial. At a hearing on the morning of trial the next day, DeLaughter echoed that the trial was going to be about nothing more than "bragging rights."[248] DeLaughter acknowledged to the FBI that he did use the term "bragging rights," as Balducci had testified.[249]

Although Peters told the FBI he "[did] not want to believe that DeLaughter's rulings favored Scruggs so that he could receive an appointment to a federal judge position," Peters did believe in the end that he "did indeed influence DeLaughter," and further conceded, despite his earlier protestations to the contrary, that "the possibility of being appointed to the federal bench may have influenced DeLaughter."[250]

DeLaughter's ruling that the Petitioner owed Wilson no further money triggered the reverse contingency fee.[251] The Petitioner paid Langston's law firm "something over two million dollars," and Langston paid Peters an additional $950,000 out of the money he received from Scruggs.[252] Langston pled guilty to a factual basis stating that he shared the proceeds of the reverse contingency with Patterson, but Patterson testified that he received no money from the reverse contingency fee.[253] Balducci also testified that he received no money from the reverse contingency fee.

Peters told the FBI that he contacted Patterson about helping DeLaughter secure a federal judgeship after *Wilson* concluded.[254] "Patterson said Peters needed to do some work on his own to help DeLaughter. Patterson told Peters that he need[ed] to get [Senator] Cochran's

[247] *Id.* at 57, 59, 122.

[248] *Id.* at 59, 123.

[249] DeLaughter 302, 12/21/07, at 5.

[250] Peters 302, 12/18/07, at 7; Peters Grand Jury Test. [135-2] at 18.

[251] Langston Grand Jury Test. [135-1] at 40.

[252] *Id.*; Patterson Dep. [135-5] at 74; Evidentiary Hr'g at 129; Peters Grand Jury Test. [135-2] at 20.

[253] Patterson Dep. [135-5] at 64–66.

[254] Peters 302, 9/9/2008, at 5.

support."[255]   DeLaughter also told the FBI that "[a]fter the trial was over, [he] telephoned Scruggs and asked for his help in getting a federal judgeship position."[256]

### E.  Conclusion

The Court finds that the Petitioner has failed to meet his burden of proof, and accordingly that his conviction for honest services fraud should be sustained.  The Petitioner was required to demonstrate that "in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him" of the crime of which he was charged.  *See Bousley*, 523 U.S. at 623, 118 S. Ct. 1604 (quoting *Schlup*, 513 U.S. at 327–28, 115 S. Ct. 851).  The Court finds that in viewing the total record, at least one juror, acting reasonably and properly instructed, would vote to convict the Petitioner of honest services fraud, as the Petitioner's conduct constituted a paradigmatic bribe under *Skilling*. *See Schlup*, 513 U.S. at 329, 115 S. Ct. 851; *Moore*, 534 F.3d at 464 n.14 (quoting *House*, 547 U.S. at 537–38, 126 S. Ct. 2064); *Bosley*, 409 F.3d at 665.

At least one reasonable and properly instructed juror would find that the Petitioner engaged in bribery which included a *quid pro quo*.  "While the form and number of gifts may vary, the gifts still constitute a bribe as long as the essential intent—a specific intent to give or receive something of value in exchange for an official act—exists."  *Kemp*, 500 F.3d at 284.  In the case *sub judice*, the Court finds that in viewing the total record, the evidence overwhelmingly shows that the Petitioner had specific intent to offer the lure of a federal judgeship to then-Judge Bobby DeLaughter to obtain a favorable ruling in the litigation pending before him.

The evidence further shows that the possibility of being recommended for a federal judgeship made DeLaughter feel that his ultimate desire was within his grasp.  "[T]he

---

[255] *Id.*
[256] DeLaughter 302, 12/21/2007, at 6.

requirement of value is satisfied if the thing has sufficient value in the mind of the person concerned so that his actions are influenced." *McDonald*, 329 So. 2d at 587–88 (Ala. App. 1975), *cert. denied*, 429 U.S. 834 (1976). To DeLaughter, the possibility of a federal judgeship nomination was doubtless "a thing of value," and a weak spot for him, that would influence him to preview motions and provide *ex parte* feedback to the Scruggs team during the pendency of the *Wilson* litigation, and that would eventually persuade him to chisel the *Wilson* case down to a worthless attempt to collect from Scruggs. The evidence further shows that Scruggs had the tools to at least convince DeLaughter that this possibility was within reach if he fulfilled his end of the deal—given Scruggs' well-known relationship with his brother-in-law, former Senator Lott, and the actions of Scruggs' team in the *Wilson* litigation to persuade DeLaughter. The case *sub judice* is similar to *United States v. Barraza*, 655 F.3d 375 (5th Cir. 2011), in which the Fifth Circuit affirmed the conviction of a state court judge who used his position to obtain sexual favors in exchange for assisting a criminal defendant. For all the foregoing reasons, the Court finds that Petitioner's conviction for honest services fraud should be sustained.

In sum, the Petitioner's motion to vacate and set aside his conviction pursuant to 28 U.S.C. § 2255 shall be denied. A separate order in accordance with this opinion shall issue this day.

THIS the 23rd day of May, 2012.

_____
SENIOR UNITED STATES DISTRICT JUDGE